IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| TGIP, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 2:06-CV-105 |
| v. | § | |
| | § | |
| AT&T CORP, ET. AL., | § | JUDGE RON CLARK |
| | § | |
| *Defendant*s. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS OF UNITED STATES PATENT NO. 5,511,114 AND NO. 5,721,768

Plaintiff TGIP ("TGIP") filed suit against Defendants AT&T Corp., Bell Atlantic Communications, Verizon Select Services, Inc., MCI Communication Services, Inc., Verizon Business Network Teleconnect Long Distance Services & Systems Company, IDT Corporation, U.S. South Communications, Inc., Interactive Communications International, Inc., Pre Holdings, Inc., and Pre Solutions, Inc. claiming infringement of United States Patent No. 5,511,114 ("the ` 114 patent") and United States Patent No. 5,721,768 ("the ` 768 patent"). The court conducted a *Markman* hearing to assist the court in interpreting the meaning of the claim terms in dispute. Having carefully considered the patent, the prosecution history, the parties' briefs, and the arguments of counsel, the court now makes the following findings and construes the disputed claim terms.[1]

---

[1]While this Order governs in the event of any conflict between the Order and the court's preliminary analysis at the hearing, the record may clarify the bases for the conclusions set out herein. The transcript of the claim construction  hearing will be cited as "Tr. p. __ , l. __."

## I. Claim Construction Standard of Review

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct. 1384 (1996) ("*Markman II*"). "The duty of the trial judge is to determine the meaning of the claims at issue, and to instruct the jury accordingly." *Exxon Chem. Patents, Inc. v. Lubrizoil Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) (citations omitted).

"'[T]he claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citation omitted). "Because the patentee is required to 'define precisely what his invention is,' it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Phillips*, 415 F.3d at 1312 (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)).

The words of a claim are generally given their ordinary and customary meaning. *Phillips* 415 F.3d at 1312. The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."[2] *Id.* at 1313. Analyzing "how a person of ordinary skill in the art understands a claim term" is the starting point of a proper claim construction. *Id.*

A "person of ordinary skill in the art is deemed to read the claim term not only in context of

---

[2]The parties, especially TGIP, were unusually reluctant to propose or agree upon the level of education and experience needed for "one of ordinary skill in the art." Tr. p. 22, l.25 - p. 26, l. 22.   Based on the patents in question, the prosecution history, a review of other patents cited in the prosecution history, and the admissions of the parties in response to the court's questioning, the court defines "one of ordinary skill in the art" in this case as someone with the equivalent of a "four-year" degree from an accredited institution (usually denoted in  this country as a  B.S or a B.A. degree) in a field such as engineering or computer science with courses covering technical aspects of communication systems and computer systems, or a minimum of two years experience in developing calling card products for the calling card industry.

the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.  Where a claim term has a particular meaning in the field of art, the court must examine those sources available to the public to show what a person skilled in the art would have understood disputed claim language to mean.  *Id.* at 1414. Those sources "include 'words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'"  *Id.*  (citation omitted).

"[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Phillips*, 415 F.3d at 1314.  In these instances, a general purpose dictionary may be helpful.  *Id.*

However, the Court emphasized the importance of the specification.  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  A court is authorized to review extrinsic evidence, such as dictionaries, inventor testimony, and learned treaties.  *Phillips*, 415 F.3d at 1317.  But their use should be limited to edification purposes.  *Id.* at 1319.

The intrinsic evidence, that is, the patent specification, and, if in evidence, the prosecution history, may clarify whether the patentee clearly intended a meaning different from the ordinary meaning, or clearly disavowed the ordinary meaning in favor of some special meaning.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995).  Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated "clear intent" to deviate

from the ordinary and accustomed meaning of a claim term by redefining the term in the patent specification. *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

The "'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321.  However, the  patentee may deviate from the plain and ordinary meaning by characterizing the invention in the prosecution history using words or expressions of manifest exclusion or restriction, representing a "clear disavowal" of claim scope. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).  It is clear that if the patentee clearly intended to be its own lexicographer, the "inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

## II. Patent Background and Technology

### The ' 114 patent

The ` 114 patent relates to a prepaid calling card system having a remote terminal to provide on-site activation and re-charging of calling cards.  The system includes four main functional components: a plurality of calling cards; a host computer; a plurality of on-site activation terminals; and a call processor.  Each of the calling cards preferably includes a body portion and a read-only memory stripe with a stored security number.  The main management and processing of the system is accomplished by the host computer, which is capable of connecting to the telephone network.  The host computer includes a database for storing security numbers associated with authorized calling cards.  The data terminals are remote from the host computer and are capable of being connected for transmitting data between the terminals and the host computer.  The call processor is controlled by the host computer for connecting one or more customers to the telephone network using the authorized calling cards.

**The ' 768 patent**

The ' 768 patent is a continuation in part of the ` 114 patent.  Focusing on the ways in which it is different from the '114 patent, the ` 768 patent discusses an alternative embodiment not discussed in the ` 114 patent, whereby a user may activate or recharge a pre-paid card account with an authorized dollar amount at a user activation terminal.  The pre-paid card account may then be used to purchase various goods and services up to the authorized dollar amount.  The activation terminals are connected to a main processor, which includes a host computer responsible for management and processing of the system through a purchasing network.  The host computer includes a data base for storing security numbers associated with authorized  card accounts and enables users to purchase goods and services up to authorized dollar amounts using the authorized pre-paid card accounts.

### III. Claim Construction

**1.  "Call Authorization amount."**  Used in ` 114 patent, Claims 1, 6, and 7; ` 768 patent, Claims 1-3, 5-11.
**"Amount of call authorization."** Used in ` 114 patent, Claims 1 and 6.
**"Active Call Authorization Amount."**   Used in ` 768 patent, Claims 1-3, and 5-11.

The parties initially stated that the primary dispute between them involves these three related claim terms.    TGIP proposed: "a call amount that is useful for obtaining call service."  Defendants suggested "any customer defined variable (i.e. not fixed or pre-set) amount, assigned to a calling card at the time of activation or recharge."  A candid discussion between the court and the parties at the *Markman* hearing revealed that the more important issue is how the term  "associating" applies to, and affects, these three terms.

To assist in the analysis,  the relevant portion of the first claim of each patent is set out with these terms in bold:

Claim 1 from the ` 114 patent:

at least one data terminal located at a predetermined location remote from the host computer and connectable to the input port **for associating, at the host computer,** an **amount of call authorization** to a security number of a calling card using data transmitted between the data terminal and the host computer during one or more charging transactions, the means for associating of the data terminal including:

means for entering the security number;

means, operative during any initial transaction and any recharge transaction, for entering any monetary amount corresponding to the **amount of call authorization**;

means for connecting to the host computer to transfer the security number and **the call authorization amount; and**

means responsive to the transfer for receiving a verification message from the host computer authorizing receipt of the monetary amount **to thereby associate at the host computer the call authorization amount to the security number,** wherein the calling card does not store the **call authorization amount**; and

wherein the database includes a record for each calling card security number having a **call authorization amount associated therewith**, the record including a balance; and

Claim 1 from the ` 768 patent:

activating the particular pre-paid calling card account in the database of prepaid [sic] calling card  accounts in response to receipt of the activation information by **associating an active call  authorization amount** with the particular **pre-paid calling card account**;

for each pre-paid calling card account that is activated, maintaining in the database information sufficient to identify:(i) a date on which the particular pre-paid calling card account is activated, (ii) a particular point-of-sale location at which the particular pre-paid calling card account is activated, and (iii) the **active call authorization amount** that was **associated with** the particular pre-paid calling card account when activated on said date and from said point-of-sale location;

At the hearing the parties agreed generally  that:

1.     The "data terminal" is the terminal at which the calling card is swiped or data is otherwise entered at the point of sale where the customer obtains the card or recharges the card.  Tr. p. 13-14; and

2.     The "host computer" is the central computer, or a system of networked computers, that keeps track of all the cards or card accounts.  Tr. p. 14-16.

The parties also agreed that, at a minimum, the three terms in dispute describe variable amounts selected by the customer.  The  real question is whether these terms can also  be defined as including a pre-set amount, say $5.00 or $10.00.  Tr. p. 11- 13, p. 34-35.   TGIP says they can.  Tr. p. 21.  The Defendants argue they can not.  Tr. p.22.

TGIP points, among other things, to ` 114 patent col. 2, ll. 52-54, which describes using a keypad at the point of sale or recharge "for entering **any** monetary amount corresponding to an amount of call authorization associated with a particular calling card . . . ."   TGIP also relies upon its request for reexamination of the ` 768 patent in which it stated that "[a]n active call authorization amount means a call amount that is then useful for obtaining the call service . . . a call authorization amount (albeit inactive) may be associated with the account prior to the user purchasing the calling card account because the calling card account is not associated with an 'active call authorization amount' until an active, or usable, amount is joined with the account. . . ." Request for Reexamination, 7/6/2000, p. 3, Ex. E to TGIP's Opening Claim Construction Brief [Doc. # 200, Attachment # 5, p. 3 of 24].  Additionally, during the reexamination process, the Board of Patent Appeals stated that claim limitations of  an "active call authorization amount" "do not require (but do not exclude) point-of-sale activation of varying call amounts . . . . The active call authorization

7

amounts could be a limited number of predetermined values as in the prior art." *See* Board of Patent Appeals Decision of 9/26/2003, Ex. H, p. 11 to TGIP's Opening Claim Construction Brief [Doc.# 200, Attachment #8, pp. 11 of 31].

The court does not discount TGIP's statement in reexamination proceedings out of hand, but recognizes that it  was submitted to the PTO after some years of disputes concerning the patents. The court must be careful about allowing statements made during a reexamination to enlarge the patent's scope, or to recapture scope which had been earlier surrendered when limiting arguments made to obtain the patent have not been retracted and brought to the attention of the new examiner. *See Creo Prods. v. Presstek,  Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002); *Hakim v. Cannon  Avent Grp., PLC*, – F.3d –, 2007 WL 542697, *3 (Fed. Cir. 2007).  This would seem especially true when the statement in question was peripheral to the issues being addressed by the examiner and the Board of Appeals.

Of course, TGIP also  relies upon the familiar cannons of construction that a patent is defined by its claims, that claims should be given their full scope, and that limitations should not be imported from descriptions of preferred embodiments.

Defendants rely heavily upon statements in  the specification such as: "The present invention relates to . . .activation and recharging of calling cards in customer defined amounts." ` 114 patent, col.1., ll. 6-9.  Defendants also argue that TGIP disavowed all cards issued in fixed or pre-set amounts pointing to statements distinguishing prior art such as:  "The most significant drawback is the requirement that pre-paid calling cards be issued in fixed or preset amounts." ` 114 patent, col. 1, ll. 46-48, and ` 768 patent, col. 1, ll. 51-53.  *See AstraZenecsa AB v. Mut. Phar. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004).

8

It appears to the court that nothing in the claim language itself eliminates all cards with a pre-set amount.[3]  The first use of the disputed phrase is in Claim 1 of the ` 114 patent: "associating, at the host computer, an amount of call authorization to a security number of a calling card . . . ." ` 114 patent, col. 6, ll. 14-16.  In Claim 1 of the ` 768 patent Reexamination Certificate ("Reexam Cert") we see: "activating the particular pre-paid calling card account in the database of prepaid [sic] calling card accounts in response to receipt of the activation information by associating an active call authorization amount with the particular pre-paid calling card account." ` 768 patent Reexam Cert, col. 1, ll. 33-37.  The statements in the specification and prosecution history of each patent establish that the intent was to go beyond the previous fixed limit card, but they do not eliminate the possibility that what is claimed is a new system which describes : (1) an "open ended" card (or one with a high upper limit) so the customer picks any amount (or any amount less than the high limit); and (2) a card with  an amount preprinted on the card, or alternatively two or more amounts, one of which must be selected by the customer.

Whether the claim language can be defined as including  this second type of card is the real dispute.  *See* Tr. p. 11-13.    Both patents use the indefinite article "an" when referring to the call authorization amount or the amount of call authorization.   The specification describes an embodiment in which there is "an amount of call authorization associated with a particular calling card . . . ." ` 114 patent, col. 2, ll. 53-54.  The court concludes that the claim language describes at least some types of cards with a pre-printed amount, or perhaps a limited choice of amounts.  To this extent,"call authorization amount" and "active call authorization" simply mean a monetary amount

---

[3]The record contains a much more detailed exposition on this issue, including the responses of the parties to various  hypotheticals.  *See* Tr. pp. 10-60.

assigned to the card or account.

But the analysis does not end there.  Two systems or scenarios for use of cards with pre-set dollar amounts are technically feasible. Tr. p. 16-18, 42.

> Scenario 1:    Cards of say $5.00 or $10.00, etc., where the security number is pre-associated with that amount at the  host computer, but the card is not valid until it is "swiped" at the point of sale so the host computer knows it is activated.  (In other words the host computer database already "knows" the security number of  the card, and the amount of the card, and all that is needed is to validate or activate the card.)

> Scenario 2:  Cards of say $5.00 or $10.00 etc., where a security number is  not associated with a particular card or amount until the card is swiped.  This could include a card with a limited number of choices available, say a choice between $5.00, $10.00, or $15.00.  (In other words the host computer database has a list of security numbers, and when a card is activated at the data terminal the amount printed on the card is associated with one of those security numbers.)

Comparing these scenarios illuminates the importance of the term "associating" and illustrates why it must be construed in conjunction with the three terms originally submitted.[4]

Claim 1 of the ` 114 patent states that as part of the system there is a host computer with an input port, and a data terminal  "connectible to the input port for **associating**, **at the host computer** an amount of call authorization to a security number of a calling card . . . ." ` 114 patent, col. 6, ll. 13-16(emphasis added).  Similarly, Claim 1 of the ` 768 patent describes a method in which  calling card account in the database is activated "by **associating** an active call authorization amount with the particular pre-paid calling card account." ` 768 patent Reexam Cert, col. 1, ll. 35-37(emphasis added).

"Associating" is an active verb, which must mean something.  If, as TGIP argues, cards could

---

[4]Of course, with a "variable" or pure "customer choice" card, no dollar amount can be associated with a security number until the customer selects an amount and activates or recharges the card for that amount.  As noted, the parties do not dispute that the patent terms define this type of transaction.

have a preset amount printed and coded on the card, along with that card's identifying or security

number, then what is left to associate by the host computer or the data terminal?  After Claim 1 of

original application for the ` 114 patent  had been rejected as obvious in light of two earlier patents,

the applicant stated:

> Claim 1 has been amended to further emphasize several of the above-identified
> features and concepts that are neither described nor obtained by Schilling, taken by
> itself or in combination with Kamil . . . For example, Claim 1 now describes . . . The
> data terminal is now described as the device in the system which is used to associate
> an amount of call authorization to a security number of a calling card using the data
> transmitted between the terminal and the host computer.

 Amendment to First Office Action, 5/18/1995, p. 8 (Bates No. TGIP 006428), Ex. 7 to Defendants'

Responsive Brief [Doc. # 207, Attachment # 7, p. 9 of 11].

To define the terms at issue so broadly  as to encompass the system of scenario 1 above,

would simply ignore this statement to the PTO, and would define "authorizing" as simply meaning

"validating."  The prosecution history makes it clear that such a construction was rejected by the

PTO.[5]  The court will define these related terms as follows:

> **"Call authorization amount"** as used in the ` 114 patent, Claims 1, 6, and 7,and
> **"amount of call authorization"**  as used in the `114 patent, Claims 1 and 6, mean:
> "a monetary amount to be used to pay for call service."

> **"Associating,** at the host computer, an amount of call authorization to a security
> number**"** as used in the ` 114 patent Claims 1 and 6, means that as part of the
> activation process, and not before, the amount of call authorization is linked in the
> host computer database to a security number for that card.

> **"Active call authorization amount"** as used in the `768 patent, Claims 1-3, and 5-
> 11 means:  "a monetary amount to be used to pay for call service."

---

[5]TGIP tries to get around the statements it made to the PTO to obtain approval of the
patent by now arguing that the security number (or other card identifier) and the monetary
amount could be combined on the card but not really be "associated" until transmitted to the host
computer or database.  This is just a fancy way of saying "validating."

"**Associating** an active call authorization amount with the particular pre-paid calling card account" as used in the `768 patent, Claims 1-3, and 5-11, means that as part of the activation process, and not before, the active call authorization amount is linked in the remote location database, to the pre-paid calling card account.

TGIP points out in its Supplemental Claim Construction Brief ("Supp. Br."), Claim 7 of the `114 patent does not include the term "associating."  *See* TGIP's Supp. Br., p. 2[Doc. # 229-1, p. 3 of 12]*.*  Claim 7 was added during prosecution after Claim 1 was rejected.  *See* TGIP's Supp. Br., p. 2 [Doc. # 229-1, p. 3 of 12].  After explaining (as set out above) that amended Claim 1 could be distinguished from Schilling and Kamil, because the data terminal associated an amount of call authorization to a security number of a calling card using the data transmitted between the terminal and the host computer, the patentee stated to the PTO:

> Independent Claim 7 is directed to a system wherein a "plurality of data terminals" are used to provide the on-site card activation capability.  **For the reasons set forth above with respect to Claim 1, Claim 7 is also patentable.**

Amendment to First Office Action, 5/18/1995, p. 9 (Bates No. TGIP 006429), Ex. 7 to Defendants' Responsive Brief [Doc. # 207, Attachment # 7, p. 10 of 11](emphasis added).  However, the effect of these statements to the PTO on the interpretation of Claim 7 is not before the court at this time.

**2. "Calling Card."**   Used in `114 patent, Claims 1, 6, and 7; `768 patent, Claims 1-3 and 5-11.

TGIP argues that the term "calling card" in the `114 patent should be construed to mean: "a body portion typically formed of cardboard or plastic on which information capable of being used to obtain telephone service is displayed, printed or stored."  Defendants propose "a card used to make calls on a telephone network."  TGIP states that the term "calling card" should not be construed in the `768 patent, and that only the term "prepaid calling card accounts" should be construed.

12

TGIP's definition implies that a "calling card" could be of almost any material and be formed in almost any shape.  Defendants agreed that they have no dispute over the material from which  the card is made, nor what its shape it is.  Tr. pp. 61- 62.

TGIP stated it understood Defendants to be arguing that a "calling card" was something that had to be physically present to make a call, but it turned out  that was not an issue either.  Tr. p. 63.

Since neither the physical composition and structure of a card nor its location during use are disputed issues, it appears that the claim language itself describes a calling card.  "[E]ach of said calling cards having a security number associated therewith that must be entered at a telephone to obtain access to the telephone network."  `114 patent, col. 6, ll. 6-9.  The specification describes the calling card in the preferred embodiment has having a security number stored on a "read-only memory stripe" and possibly also "in cleartext under a suitable blackout."  `114 patent, col. 2, ll.36-39.  A similar description is found at `114 patent, col. 3, ll. 42-48.  The same construction was given to the PTO during the application process.  "Claim 1 now describes that the calling card has a security number associated therewith that must be entered 'at the telephone' to obtain access to the telephone network."  Amendment to First Office Action, 5/18/1995, p. 8 (Bates No. TGIP 006428), Ex. 7 to Defendants' Responsive Brief [Doc. # 207, Attachment # 7, p. 9 of 11].

 At the hearing Plaintiff gave this   description of a calling card, and Defendants agreed that this was a proper definition.  Tr. p.  66, l. 4 - p. 67, l. 1.   Plaintiff then began to argue that a calling card should not be defined  has having a security number which was used to obtain access to a phone network or system.  "But it doesn't have to be a security number, your Honor.  It could be a PIN

13

number.  It could be a tracking number."[6]  Tr. p. 68, ll. 7-9; *see also* Tr. p. 71.  Arguing over semantical differences of common homonyms is not claim construction.

Counsel could not identify a single reference in the patent or prosecution history that hints at a calling card, which does not have a security number (or access information as defined below) associated with it, either before of after activation, which must be used to obtain access to the phone system or network.  Plaintiff's argument that "calling card" has different meanings in the different claims is without support in the record, and flies in the face of the rule that ordinarily the same term in different claims of a patent has the same meaning.  This argument also contradicts the admission in TGIP's brief that all claims require that "they [calling cards] be used to access a telephone network."  TGIP Br., p. 24 [Doc.# 200, p. 28 of 37].

The fact that calling cards may be used in various way to obtain access in the different systems described by the claims does not imply that the term "calling card" should be defined differently.  For example, the fact that the security number or password could be memorized and used after throwing away the physical card does not mean that the card did not exist initially.

The court recognizes that defining a term as it is defined in the claim could result in some redundancy if the definition is substituted for the word defined.  But when one side is obviously planning on focusing at least part of  its case on that term, such a definition  will be  more clear than simply leaving the issue open to the arguments of counsel.  The court  will  define this term as

---

[6] Plaintiff's counsel was honest in admitting that Plaintiff simply did not want to be pinned down. Tr. p. 70, ll. 14-19.  The court understands that if patentees commit to a construction they may lose the flexibility to sidestep invalidity claims.  *See* James M. Amend, *Patent Law: A Primer for Federal District Court Judges* 19-20 (1998).  But at some point the court has to construe the claims, and it is incumbent upon the parties to present their best evidence and arguments at the *Markman* hearing, not on appeal.

follows:

> **"Calling card"** means "a card, which may be made of various materials and in
> various shapes, which has associated with it a combination of numerals, letters,
> and/or characters (sometimes called a security number or code) that can be entered
> at a telephone to obtain access to the telephone network or system."

**3.  "Prepaid Calling Card Accounts."**  Used in ` 768 patent, Claims 1-3 and 5-10.

TGIP proposes "prepaid accounts capable of being used to obtain telephone service."  The
Defendants do not think this term should be construed.  If the term is construed, Defendants suggest
"an account associated with a prepaid calling card."

The `768 patent describes a "pre-paid card system  having a remote terminal to provide on-
site **activation and recharging of cards** in customer defined amounts."  ` 768 patent, col. 1, ll. 12-
14 (emphasis added); *see also* ` 768 patent, Abstract.  During the reexamination process the patentee
distinguished the ` 768 patent from an earlier Japanese patent (Yamaki) in view of an earlier U.S.
patent (Leaden, U.S. Patent No. 5,327,485) by asserting that the ` 768 patent system did not involve
cards.  TGIP emphasizes that the ` 768 patent Reexamination Certificate claims only systems with
"pre-paid calling card accounts," and that there is no requirement for there ever to have been a
calling card.   (Actually, the patent and the prosecution history strongly suggest that the system
involves the distribution of  physical cards of some type, and certain claims actually use that term,
but this does not affect the analysis. )

As with the ` 114 patent, nothing suggests that a physical card must be maintained or actually
present to make a phone call.  The security number (or whatever one wants to call the code or

15

information used to access the telephone system and charge the call against the particular calling card account) can be memorized.   But to simply say a "prepaid calling card account" is merely a prepaid account capable of being used to obtain telephone service is simplistic and would include the account of every homeowner who pays the monthly bill in advance for basic land line service.

The `768 patent is a continuation in part of the `114 patent.  While the `768 patent focuses on a system of "accounts" rather than on the "pre-paid cards" no attempt is made to suggest that each of these accounts is not  associated with some kind of distinguishing access information, sometimes called a "security number," `768 patent, col. 3, ll. 64-65, or "security code," `768 patent, col. 5, l. 47, which the user enters to gain access to the system.   To the contrary, the patentee constantly emphasizes the connection between the account and a security number.  `768 patent, col. 2, ll. 36-38; `768 patent, col. 2 ll. 51-52; `768 patent, col. 2, l. 62- col.3, l. 1.  Even the alternative embodiment describing cards other than calling cards associates the card or card account with a security number.  `768 patent, col.  3, ll. 17-18; s*ee also* `768 patent, col. 3, ll. 61-63; `768 patent col. 4, ll. 66 - col. 5, l. 5; `768 patent, col. 5, ll. 46-48; `768 patent, col. 6, ll. 10-12.

Therefore, the court will define this term as follows:

**"Pre-paid calling card account"** is "a record maintained in a data base  which, when  activated, allows a user with the access information for that account to obtain access to a phone system or network."


**4. "Data Terminal."**  Used in `114 patent, Claims 1-7; `768 patent, Claims 1, 3, and 5.

TGIP states that this claim does not need to be construed.  If it is construed, TGIP proposes "a device capable of receiving data and transmitting data."  Defendants suggest "a device for on-site

point-of-sale activation and recharging of prepaid calling cards."

As the parties agreed at the hearing, the data terminals described in these patents are connected to the host computer and transmit information, specifically charging and recharging information,  between the terminal and the host computer.  Tr. p. 79-80;  *see* ` 114 patent, col. 2, ll. 60-61; ` 114 patent, col. 4, ll. 13-15.   The only dispute between the parties is whether a data terminal must always be  used for activation and for recharging of a card.

The specification states: "The data terminals allow for point-of sale variable authorization and recharging of calling cards."  ` 114 patent, col. 4, ll. 44-45.  This implies that the devices have the capability to do both.  Both sides agreed to this.   Tr. pp. 81-83, 87.  But "allows for" is permissive, not mandatory.

Just because the device "allows for" charging and recharging does not meant that it has to be used for both.  A data terminal at a  kiosk in a mall which was always available for recharging by those who already had a card might be used for activation only when  an employee was available to manually hand out the cards themselves.   How the data terminal is actually used will depend on the language of the claim under consideration.  The court will define this term as follows:

> **"Data terminal"** means "a device that can transmit and receive data to a host
>
> computer to allow for charging and recharging a calling card or calling card account."

**5. "Predetermined location."**  Used in ` 114 patent, Claim 1.

**6.  "Point-of-sale location."**  Used in ` 768 patent, Claims 1-2, and 5-11.

The first  term appears in Claim 1 of the '114 patent as follows:

>    A pre-paid calling card system to enable customers to purchase calling cards at **predetermined locations** and to use such calling cards to access . . . .

The second term appears in Claims 1 and 2 of the ` 768 Reexamination Certificate as follows:

>  Claim 1: A method to enable customers to obtain pre-paid calling card accounts from a plurality of **point-of-sale locations** and to . . . .

>  Claim 1 & 2:   maintaining in the database information sufficient to identify: . . .  a particular point-of-sale location at which the particular pre-paid calling card account is activated ("recharged" in Claim 2).

 Defendants propose for both terms, "a  retail or other establishment where a customer obtains a calling card."  TGIP argues that neither of these terms need to be construed.  If "predetermined location" is construed, TGIP proposes "a location determined beforehand."  If "point-of-sale location"  is construed, TGIP suggests "location at which the sale takes place."

At the hearing Defendants agreed with the court's proposal of "a business establishment or kiosk, which may be automated or staffed by one or more persons."  TGIP objected, asking why a "point-of-sale location" could not include on line purchasing.  Tr. p. 96.  TGIP's counsel envisions customers activating cards from their personal computers by visiting a website.  Tr. p. 97.  But the court must construe the terms as understood by one skilled in the art, reading those terms in the context of the specification and file history.

Web sites were known when the first application was filed on June 6, 1994, and were well known by the time the reexamination certificate was issued in 2005.  *See*

http://www.matterform.com/macintosh_software_company/old_sites.html (showing a Matterform Media website online in 1994).  Nothing in the claims, nor in the prosecution history, nor even in the extrinsic evidence, including articles written by the inventor and announcements concerning his calling card systems hints at sales from a website.  To the contrary the specification describes physical locations.  *See* ` 114 Patent, col. 5, ll. 42-44.

In normal usage a "predetermined location" and a  "point of sale location" refer to a place, such as  the establishment of the retailer.  If it was a disembodied electronic construct, such as a website, there would be no reason for Claims 1 and 2 to put such emphasis on the database maintaining "a particular point-of-sale location at which the particular pre-paid calling card account is activated [or recharged]."  ` 114 patent, col. 1, ll. 41-43; ` 114 patent, col. 2, ll. 12-14.  There would actually be no "point of sale" or "predetermined location.  Rather the sale would be made wherever the user had a laptop.

The patentee had the opportunity to pick his language.  He did not attempt to include incorporeal constructs like websites as possible locations.  The court is not going to broaden the scope of the patents in such a way at this time.  These terms will be defined as follows:

> **"Predetermined locations"** and **"Point-of-sale locations"** mean "a business establishment or kiosk which may be automated or staffed by one or more persons."

## 7.  **"Access information."** Used in ` 768 patent, Claims 1, 3, 5, 7, 9, and 11

The parties agree the terms "activation information," "access information," and "recharge information" are closely related.  The parties state that the issue with these three claim terms is whether a single security number must be used to activate, use and recharge a prepaid calling card.  "Activation" involves associating a dollar amount with  a new card or account. "Access" involves

actually  using the phone, thus depleting the monetary value stored in the account.   "Recharge" involves associating a dollar amount for a card or account which  has already been established.

TGIP suggests that "access information" means: "data transferred or received in connection with the attempted use of an account." Defendants propose "information including the security number entered to  access the telephone network."

Every independent claim of the ` 768 patent describes a method by which someone with a pre-paid calling card account uses a telephone to obtain access to a telephone network by transmitting "access information," which is used by the call processor to identify "the particular prepaid  calling card account."  *See* ` 768 patent Reexam Cert, col. 1, ll. 47-53 (Claim 1); ` 768 patent Reexam Cert, col. 2, ll. 38-44 (Claim 3); ` 768 patent Reexam Cert, col. 3, ll. 30-36 (Claim 5); ` 768 patent Reexam Cert, col. 4, ll.  25-27 (Claim 7); ` 768 patent Reexam Cert, col. 5, ll. 13-18 (Claim 9);  ` 768 patent Reexam Cert, col. 6, ll. 23-26 (Claim 11).  None of the independent claims omit this step.  The specification describes this process as a user making a call by accessing a phone number to which the host computer is connected.  The user enters the "security code," and if the account has a positive balance, the user is prompted to enter the desired phone number.  ` 768 patent, col. 5, ll. 42-55.

TGIP objects to the use of the word "security number," raising the familiar argument that the specification recites but  a single embodiment and that limitations of the specification should not be imported into the claims.  That does not get around the language of the claims themselves, which require in each case that the "access information" is used by the call processor to identify a "particular," i.e. a single, prepaid calling card account. If a unique set of access information identified more than one calling card account, more than one account would be billed  for the same

20

call.  *See e.g.*  `768 patent Reexam Cert, col. 1, ll. 54-56 (Claim 1); ` 768 patent Reexam Cert, col. 2, ll. 44-47(Claim 3). Each unique set of access information must identify only one pre-paid calling card account.

Perhaps this access information is given the  name "security code" only in the specification.  In some cases, as suggested by TGIP's counsel  it might be called a "PIN number."  It could be called the  "password" for the calling card account.  The precise name is not important.   There is a  combination of numerals, letters, and/or characters that can be transmitted from a phone to a call processor.  Each such combination  is associated with only one ("a particular") pre-paid calling card account.  The court defines this term as follows:

> **"Access information"** means "a combination of numerals, letters, and/or characters that can be transmitted from a phone to a call processor, which identifies one, and only one pre-paid calling card account."

8. **"Activation information."** Used in ` 768 patent, Claims 1, 3, 5, 7, 9, and 11.

For  "activation information" TGIP  proposed "data transferred or received in connection with the activation of an account."  The Defendants suggest "information including the security number communicated during activation of the calling card account."

Both these definitions are somewhat circular, each using "activation" as part of the definition of "activation information."  The claims disclose that  "activation information  is transferred to the host computer.  ` 768 patent Reexam. Cert, col. 1, ll. 21-26.  With the variable dollar amount accounts this might  just be the calling card account number and the dollar amount purchased.  *See* ` 768 patent Reexam. Cert, col. 1, ll. 35-37; ` 768 patent Reexam Cert, col. 1, ll. 66 - col. 2, l. 7;

21

Case 2:06-cv-00105-RC   Document 238   Filed 03/12/07   Page 22 of 28 PageID #:  3649

` 768 patent, col. 5, ll. 64 - col. 6, l. 13.  Because  the data terminals can transmit and receive data, there is no reason the host computer can not select a password (the access information), associate it with the account and the dollar amount and send to  the data terminal, to be given to the customer. For example, after the host computer receives the dollar amount the customer wants, it could select a password from a list, associate it with that account,  and send it to the data terminal, which would print that number   out on paper or even on the  card itself.  *See* ` 768 patent, col. 6, ll. 1-12 (describing data terminal transmitting a message to the operator of the data terminal).

There is no absolute requirement for the "access information"  to be transmitted to the host computer during initial activation.   The court will define this term as follows:

**"Activation  Information"** means "the data transmitted that initially makes it possible to associate a dollar amount with a particular  calling card account."

**9.  "Recharge information."**   Used in ` 768 patent, Claims 2, 3, 6, 10, and 11.

TGIP offers "data received in connection with the recharge of an account." Defendants argue for "information including the security number communicated during the recharge of the calling card account."   For the reasons stated above, the court concludes that there must be a combination of numerals, letters, and/or characters associated with each activated account.  This is referred to in the claims as "access information" *See, e.g.,* `768 Reexam Cert, col. 1, ll. 47-51.  For marketing purposes it might be given any number of names, including   "security code" as seen in the specification. ` 768 patent, col. 5, l. 47.  For convenience the court will use "password."

As explained above, the claims do not require transmission of the password to the host computer at the time of activation of the card.  The question is whether the password must be used

to recharge the card?

An example from the specification and claims may clarify the differences and similarities between activation, access and recharge.  *See* ` 768 patent, col. 5, l. 64 - col. 6, l. 13; ` 768 patent Reexam. Cert., col. 1, ll. 18-57.   To activate an account, a customer asks a store clerk for  $12.00 of calling time.  The clerk selects card number 55 and uses the data terminal to transmit that number, which designates a calling card account number in the data base, to the host computer.  The computer associates $12.00 with account 55 and with a  password, say 44,  and transmits the message that the password has been activated for the amount of $12.00.

To access a phone network the customer dials a number to which the host computer is connected and is prompted to enter the password, 44, but not necessarily the card number, 55.   The computer keeps track of the time used and deducts it from the $12.00 balance.  To recharge the card the customer goes back to the clerk and asks for $15.00 to be added to the account.  The clerk must transmit information identifying the account number.  The account now has two numbers associated with it - the card number 55, and the password 44.   As written, the claims allow a programmer to program the host computer to accept either or both numbers for a recharge,  since both now identify the account.

 It might make  sense in a recharge situation to follow the preferred embodiment and transmit a "security code" (the password)  from the card.  ` 768 patent, col. 5, ll. 42- 50.  But  there is nothing in the claim language or specification to indicate that the account number can't be combined in the same data field with the password at the time of initial activation.  In such a case it would be feasible to transmit the card number and not the password, although once the card is activated those numbers are inextricably linked.  Therefore the court defines this term as follows:

23

**"Recharge information"** means: "data transmitted that makes it possible to associate a dollar amount with a particular previously activated    calling card account."

## MEANS-PLUS-FUNCTION CLAUSES

The remaining terms the parties ask the court to construe involve means-plus-function clauses under 35 U.S.C. § 112(6).  Where a claim includes the word "means," a presumption is invoked that § 112(6) applies.  *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005).  This presumption may be rebutted if the claim recites "sufficient structure for performing the claimed function . . . ."  *Id.*

Determining the claimed function and the corresponding structure of means-plus-function clauses are matters of claim construction.  *WMS Gaming Inc., v. Int'l Game Tech.*, 184 F.3d 1339, 1347 (Fed. Cir. 1999).  Claim construction of a means-plus-function limitation involves two steps. *See Medical Instrumentation and Diagnostics v. Elekta*, 344 F.3d 1205, 1210 (Fed. Cir. 2003).  The court must first identify the particular claimed function, and then look to the specification and identify the corresponding structure for that function.  *Id.*  "Under this second step, 'structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'"  *Id.* (citations omitted).  "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function."  *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005).

**10. "Means for entering the security number."** Used in `114 patent, Claims 1 and 2.

**"Means, operative during any initial transaction and any recharge transaction, for entering any monetary amount corresponding to the amount of call authorization."** Used in `114 patent, Claims 1 and 3.

**"Means, operative during any initial transaction, for entering a monetary amount corresponding to the amount of call authorization."** Used in `114 patent, Claim 6.

The parties agree, and the court finds, that these are means-plus-function terms governed by 35 U.S.C. § 112 (6). Both parties agreed at the hearing that the function for these terms was "inputting or entering a security number [or monetary amount]." *See* Tr. p. 120. The dispute is over the corresponding structure. TGIP argues that the corresponding structure is: "(1) a keypad; (2) a cardreader; (3) an optical scanner; and (4) a voice recognition card connected to a microphone for providing limited speaker-independent or speaker-dependent discrete or continuous voice recognition, or any equivalents of the above." Defendants state that the structure is: "(1) keypad 32 having alphanumeric and control keys, and/or (2) the voice recognition card connected to a microphone."

The specification describes a number of ways in which data (whether a security number or a monetary amount) can be entered. The `114 patent states that "each data terminal **14** includes means (such as a cardreader) for reading a calling card to determine the security number stored . . . .**"** `114 patent, col 4, ll.16-17. The specification also describes a "means (such as a keypad) for entering any monetary amount corresponding to an amount of call authorization associated with a particular calling card . . . ." `114 patent, col. 4, ll 19-20.

The specification goes on to state that "[t]hese particular input/output devices of the data terminal are merely exemplary . . . For example, the *cardreader* may replaced . . . with an *optical*

*scanner* (to read a bar code or the like)." ` 114 patent, col. 4, ll 30-32 (emphasis added).  "Likewise, the *keypad* may be replaced or supplemented with a *voice recognition card* connected to a microphone for providing limited speaker-independent or speaker-dependent discrete or continuous voice recognition." ` 114 patent, col. 4, ll 37-40 (emphasis added).

At the hearing, Defendants refined their position and argued not that the card reader and optical scanner were not disclosed, but that the card reader and optical scanner "read" and not "entered" data.  *See* Tr. p. 123.  Defendants' argument is based on their assertion that a person of ordinary skill in the art would read the claims so that a structure which "reads" a security number or monetary amount would not be seen or recognized as a structure which "enters" a security number or monetary amount.  This seems hyper-technical.  It is true that when an optical scanner "reads" a password or card number in a bar code the information is transformed into electronic impulses which are transmitted electronically to a data base or a printer where it might properly be said to be "entered."  But the same is true for a keypad.  The clerk does not physically inscribe data onto a computer data base or printout.  The clerk pushes the keys to enter the password or card number or monetary amount.  The keystrokes are transformed into electronic impulses which are transmitted to the data base or printer.  The specification links the cardreader and the optical scanner to the function of inputting or entering a security number or a monetary amount. *See Default Proof Credit Card System, Inc*, 412 F.3d at 1298.

For these terms, the court concludes that the function is: "inputting or entering a security number [or a monetary amount]," and the corresponding structure is: "(1) a keypad; (2) a cardreader; (3) an optical scanner; and (4) a voice recognition card connected to a microphone for providing limited speaker-independent or speaker-dependent discrete or continuous voice recognition."

## REMAINING TERMS

The parties identified eleven more means-plus-function terms which they said they would submit on the briefs alone.  For these terms, the parties agree on the means and the function, but disagree over the structure.  TGIP devoted only 2 ½ pages of its 31 page opening brief, and none of its 13 page reply brief, to addressing these terms.  Likewise, Defendants only addressed 3 ½ pages of their 30 page response brief to these terms.  All together, this is 6 pages of the parties' 73 pages of briefing.  The court has been given no assistance in determining the merits of the parties' claims.

Courts have consistently held that inadequate briefing results in a waiver of a party's arguments. *See, e.g., United Fire and Cas. Co. v. Hixson Brothers Inc.*, 453 F.3d 283, 285 n. 3 (5th Cir. 2006); *Raniola v. Bratton*, 243 F.3d 610, 613 n. 1 (2nd Cir. 2001); *Cannon v. Gibson*, 259 F.3d 1253, 1272 n. 20 (10th Cir. 2001). Moreover, in patent law, it is well established that "although every word used in a claim has a meaning, not every word requires a construction." *Orion IP, LLC v. Staples, Inc.,* 406 F.Supp.2d 717, 738 (E.D. Tex. 2005).  The only terms that need to be construed are those "that are in controversy, and only to the extent necessary to resolve the controversy."  *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

The parties have an affirmative duty to submit only those terms which are actually in dispute, and to adequately present arguments in support of their positions.  *See Orion IP, LLC*, 406 F.Supp.2d at 738.  Simply because this court did not limit the number of claim terms the parties could submit does not entitle the parties to submit numerous claim terms without adequate briefing in hopes of needlessly complicating the proceedings, and perhaps creating some basis for error.

Defendants did move for summary judgment on four of these remaining terms arguing that sufficient structure was not disclosed.  Because there is additional information on these terms, and there appears to be an actual dispute, the court will consider the parties' arguments concerning structure disclosed for these claims once the summary judgment briefing is complete. The fact that Defendant did not move for judgment on the other terms is a good indication that there is no real dispute over the claimed structure.  Under these circumstances, given the lack of briefing, the court will not construe the other seven means-plus-function terms at this time.

## IV.  Conclusion

The jury shall be instructed in accordance with the court's interpretation of the disputed claim terms in the ` 114 and ` 768 patents.

So **ORDERED** and **SIGNED** this **12** day of **March, 2007.**

_____

Ron Clark, United States District Judge