IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

**FILED**

P.M. _September 14_ 20 _07_
DAVID J. MALAND, CLERK
U.S. DISTRICT COURT
By _____
                              **DEPUTY**

| | | |
|---|---|---|
| TGIP, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 2:06-CV-105 |
| AT&T CORPORATION, | § | |
| | § | |
| *Defendant.* | § | JUDGE RON CLARK |
| | § | |
| | § | |
| | § | |

## JURY INSTRUCTIONS

You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you, the jury, are the judges of the facts. Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments. Statements and arguments of the attorneys are not evidence and are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

When words are used in these instructions in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer each question from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

## I. What is and What is not Evidence

You will be instructed to answer some questions based upon a **"preponderance of the evidence."** This means you must be persuaded by the evidence that the claim is more probably true than not true.   You will be instructed to answer other questions by **"clear and convincing evidence."** This is a higher burden than by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.  Clear and convincing evidence is evidence that shows something is highly probable.  In deciding whether any fact has been proved in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately.  So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

In making up your mind and reaching your verdict, do not make your decisions simply because there were more witnesses on one side than on the other.  Do not reach a conclusion on

a particular point just because there were more witnesses testifying for one side on that point. The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw, from the facts that have been established by the testimony and evidence in the case.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence – such as testimony of an eyewitness. The other is indirect or circumstantial evidence – the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

During the trial I sustained objections to certain questions and exhibits. You must disregard those questions and exhibits entirely. Do not speculate as to what the witness would have said if permitted to answer the question or as to the contents of an exhibit.

Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case. Except for the instruction to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

3

If you have taken notes they are to be used only as aids to your memory, and if your memory should be different from your notes, you should rely on your memory and not on your notes. If you did not take notes, rely on your own independent memory of the testimony. Do not be unduly influenced by the notes of other jurors. A juror's notes are not entitled to any greater weight than the recollection of each juror concerning the testimony.

If scientific, technical, or other specialized knowledge may be helpful to the jury, a witness with special training or experience may testify and state an opinion concerning such matters. However, you are not required to accept that opinion. You should judge such testimony like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case.

In deciding whether to accept or rely upon the opinion of such a witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he testifies regularly as an expert witness and that his income from such testimony represents a significant portion of his income.

## II. United States Patents

This is a patent case. Patents are issued by the United States Patent and Trademark Office, which is part of our government. The government is authorized by the United States Constitution to enact patent laws and issue patents to protect inventions. Inventions that are protected by patents may be of systems, or of methods for doing something, or for using or making a product.

The owner of a patent has the right, for the life of the patent, to prevent others from making, using, offering for sale, or selling the invention covered by the patent.

A patent is granted for a set period of time. During the term of the patent if another person makes, uses, offers to sell, or sells something that is covered by the patent without the patent owner's consent, that person is said to infringe the patent. The patent owner enforces a patent against persons believed to be infringers in a lawsuit in federal court, such as in this case.

To be entitled to patent protection an invention described in a claim must be new, and nonobvious, or the claim is "invalid." A patent cannot legally take away from people their right to use that which was known, or that which was obvious from what was known, before the invention was made. That which was already known at the time of the invention is called the "prior art." You have heard about the prior art relating to the patents-in-suit during the trial, and I will give you more instructions about what constitutes prior art in these instructions.

### III.  The Nature of the Action, the Parties, and the Contentions

The first patent involved in this case is United States Patent No. 5,511,114, also referred to as the ` 114 patent. The second patent is United States Patent No. 5,721,768. This patent was subject to reexamination, so claims for that patent are set out in the reexamination certificate. This may be referred to as the ` 768 patent.  The owner of the patents is TGIP, Inc. ("TGIP").

The Plaintiff, TGIP, contends that the Defendant AT&T Corporation ("AT&T") makes, uses, offers to sell, or sells a prepaid calling card system that infringes claims 1 and 6 of the ` 114 patent, and claims 1 and 11 of the ` 768 patent.  TGIP also asserts that this infringement is willful.

AT&T denies that it is infringing either the ` 114 or the ` 768 patent. AT&T also contends that the ` 114 and the ` 768 patents are invalid. Invalidity is a defense to infringement. Therefore, even though the PTO examiner has allowed the claims of the ` 114 and the ` 768 patents, you, the jury, have the ultimate responsibility for deciding whether the claims of the ` 114 and the ` 768 patents are valid.

Further, AT&T contends that TGIP delayed unreasonably and inexcusably in asserting TGIP's claim of infringement.

### IV.  Claim Construction and Claim Interpretation

Before you decide whether AT&T has infringed the claims of TGIP's patents or whether TGIP's patents are invalid, you will have to understand the patent claims. The patent claims are numbered sentences at the end of the patent. Each claim describes a separate invention. The claims are divided into parts or steps called "limitations" or "elements." The claims are "word pictures" intended to define, in words, the boundaries of the inventions.  Only the claims of the

patents can be infringed. Neither the written description, sometimes called the specification, nor the drawings of a patent can be infringed. Each of the claims must be considered individually.

In this case, there are three "system" claims. They are claims 1 and 6 of the ` 114 patent, and claim 11 of the ` 768 patent. These describe a physical entity such as a product or an apparatus. Claim 1 of the ` 768 patent is a "method" claim. It refers to an activity, or a series of steps to perform a process.

To decide the questions of infringement and invalidity, you must first understand what the claims of the patents cover, that is, what they prevent anyone else from doing. This is called "claim interpretation." You must use the same claim interpretation for both your decision on infringement and your decision on invalidity.

It is my duty as Judge to explain what some of the words used in the patent claims mean. Attached as Appendix A to this charge is the text of the claims of the patents-in-suit. In each claim I have set in bold the terms which I have defined for you. The definitions appear following the claims in Appendix A. You must accept as correct the definitions contained in Appendix A. There are several clauses used in claims 1 and 6 of the ` 114 patent in a special form called a "means-plus-function" clause. This type of clause in a claim does not cover all possible structures that perform the recited function, but covers only the structures described in the patent specification and drawings that perform the respective function, or an equivalent of that structure. For each means plus function clause in issue, I have determined the corresponding structures in the patent specification that performs that function. These are also set out in Appendix A. You must use my interpretation of the means-plus-function elements in your deliberations regarding infringement and validity.

The claim language I have not defined for you in Appendix A is to be given its ordinary and accustomed meaning as understood by one of ordinary skill in the art, in the context of the patent specification and prosecution history.

A person of ordinary skill in the art in this particular case is a person that would have at least a Bachelor's degree in a field such as engineering or computer science with courses covering technical aspects of communication systems and computer systems, or a minimum of two years experience in developing calling card products for the calling industry.

## V. Infringement

### Direct Infringement

TGIP contends that AT&T's prepaid calling card system infringes claims 1 and 6 of the ` 114 patent, and claims 1 and 11 of the ` 768 patent. Someone can directly infringe a patent without knowing they are doing so, and even if they believe in good faith that what they are doing is not infringement.

It is not necessary for the acts that constitute infringement to be performed by one person or entity. When infringement results from the participation and combined actions of two or more persons, or entities, which have some connection with each other, such as an agreement to work together, or a partnership, or the ability of one to control another, then they are all joint infringers and jointly liable for patent infringement. Infringement of a patented method cannot be avoided by a connected person or entity having another connected person or entity perform one or more steps of the method.

There are two ways in which a patent claim can be directly infringed. First, a claim can be literally infringed. Second, a claim can be infringed under what is called the "doctrine of

8

equivalents." In either case, however, just because a system or method accomplishes the same goals as a patent claim, does not mean it infringes that claim.

### 1. Literal Infringement

A patent claim is literally infringed only if AT&T's prepaid calling card system or method includes each and every element in that patent claim. If AT&T's prepaid calling card system or method omits even one of the elements in that claim, AT&T does not literally infringe that claim. You must determine literal infringement with respect to each patent claim individually.

### 2. Infringement by Equivalents

If a company makes, uses, sells, offers to sell within, or imports into the United States a product that does not meet all the requirements of the claim, there can still be direct infringement if that product satisfies that claim under the doctrine of equivalents.

I will now explain the circumstances under which you may find that a product satisfies a claim under the doctrine of equivalents.

Under the doctrine of equivalents, a product satisfies a claim if, for each and every requirement of the claim that is not literally present in the accused product, the accused product has some corresponding alternative feature that is equivalent to the unmet claim requirement. I will explain to you shortly what equivalent means. Depending on the nature of the requirement that is not met literally, the alternative feature of the product may be an alternative component.

In making your decision as to whether or not a product is equivalent under the doctrine of equivalents, you must look at each and every requirement of that claim and decide whether or not the product either meets that requirement or has some alternative feature that is equivalent to the unmet requirement. If it does, the product satisfies the claim under the doctrine of

equivalents. If, instead, (1) the product has an alternative to the unmet requirement but the alternative is not equivalent to the unmet requirement; or (2) the product has no corresponding alternative feature to the unmet requirement, you must find that the requirement is not satisfied under the doctrine of equivalents and there is no infringement under the doctrine of equivalents.

I will now explain how to determine whether an alternative feature of the product at issue is "equivalent" to a requirement of the claim. An alternative is considered to be "equivalent" to an unmet requirement of a claim if a person having ordinary skill in the field of technology of the patent, as I have defined that person for you, would have considered the differences between them to be "insubstantial" at the time of the alleged infringement. In deciding whether an alternative feature of the product is equivalent to an unmet requirement of the claim, you may consider whether the alternative feature and the unmet claim requirement: (1) perform substantially the same function; (2) work in substantially the same way; (3) to achieve substantially the same result. You may also consider whether, at the time of the alleged infringement, the person I have defined for you as having ordinary skill in the field of technology of the patent would have known of the interchangeability of the alternative feature and the unmet requirement of the claim. Interchangeability at the present time is not sufficient in order for the structures to be considered interchangeable, rather, the interchangeability of the two structures must have been known to persons of ordinary skill in the field of technology of the invention at the time the invention was made.

In order to prove infringement by "equivalents," TGIP must prove by a preponderance of the evidence that any differences between the unmet requirement and the alternative are insubstantial. This means that TGIP must prove that it is more likely than not that AT&T's

10

products and services have an alternative feature that is "equivalent" to the unmet claim requirement.

The doctrine of equivalents cannot be used to "eliminate" a claim limitation. Each element contained in a patent claim is deemed material in defining the scope and limits of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claims, not to the invention as a whole. The public is entitled to rely on the limitations of the claims in order to avoid infringement. Therefore, the doctrine of equivalents cannot be used to erase the limitations found in the claims. Application of the doctrine of equivalents is improper if it would render any claim limitation unnecessary.

The doctrine of equivalents is also limited by what is called "prosecution history estoppel." During prosecution of the patent, the patent applicant often makes arguments and amendments in an attempt to convince the patent examiner to grant the patent. The party seeking to obtain a patent may amend his patent claims or submit arguments in order to define or narrow the meaning of the claims to obtain the patent. Once it has done so, it is not entitled to patent coverage under the doctrine of equivalents that would be so broad that it would cover the same feature that was used to distinguish the invention during the prosecution of the patent.

### "Comprising" Claims

The preambles to claims 1 and 6 of the ` 114 patent, and claims 1 and 11 of the ` 768 patent, use the phrase "comprising." The word "comprising" means "including the following but not excluding others."

If you find that AT&T's prepaid calling card system includes all of the elements in claim 1 of the ` 114 patent, for example, the fact that AT&T's system might include additional steps

11

would not avoid infringement of that claim.

**"Means Plus Function" Claims**

Claims 1 and 6 of the ` 114 patent contain means-plus-function clauses. As I have said, in Appendix A, I have provided for you the function that each of the means-plus-function claim limitations performs, along with the structure disclosed in the specification that corresponds to each means-plus-function limitation. To show infringement, it is TGIP's burden to prove that it is more likely than not that the part of AT&T's prepaid calling card system that performs each function is identical to, or equivalent to, the structure described in the specification for performing the identical function.

In deciding whether TGIP has proven that AT&T's prepaid calling card system includes the structure covered by a means-plus-function requirement, you must first decide whether AT&T's system has any structure that performs the function I described. If not, the claim containing that means-plus-function requirement is not infringed.

If you find that AT&T's accused system does have a structure that performs the claimed function, you must next identify that structure. You must then determine whether TGIP has proven that that structure is either identical to, or equivalent to, any structure I have listed in Appendix A for performing that claimed function. If they are the same or equivalent, the means-plus-function requirement is satisfied by that structure of AT&T's prepaid calling card system. If all the other requirements of the claim are satisfied by structures found in AT&T's prepaid calling card system, the system infringes the claim.

Whether the structure of AT&T's prepaid calling card system is equivalent to a structure described in the patent specification is decided from the perspective of a person of ordinary skill

12

in the art. If a person of ordinary skill in the art would consider the differences between the structure found in AT&T's product and a structure described in the patent specification to be insubstantial, the structures are equivalent.

### Actual Use

To prove direct infringement of a claim, TGIP must prove AT&T's system has been made, used, sold, or offered for sale in a manner covered by that claim. AT&T's system may be found to infringe a claim if it is reasonably capable of satisfying each element of that claim without being altered.

### VI. Willful Infringement

In this case, TGIP argues both that AT&T infringed and that AT&T infringed willfully. To prove willful infringement, TGIP must prove by clear and convincing evidence that:

(1) AT&T was aware of the ` 114 and the ` 768 patents;

(2) AT&T engaged in the accused infringing activities recklessly and without a reasonable basis for believing that AT&T's system or method did not infringe the ` 114 and the ` 768 patents or that the ` 114 and the ` 768 patents were invalid. Specifically, TGIP must show that AT&T acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, and that this objectively defined risk was either known or so obvious that it should have been known to the accused infringer. The state of mind of AT&T is not relevant to this objective standard.

In deciding whether AT&T committed willful infringement, you must consider all of the facts, which include but are not limited to:

(1) Whether AT&T intentionally copied a system or method covered by the ` 114 or ` 768

patent;

(2) Whether AT&T, when it learned of TGIP's patent protection, investigated the scope of the patent and formed a good faith belief that the patent was invalid or that it was not infringed before AT&T started or continued any possible infringing activity;

(3) Whether AT&T had a substantial defense to infringement and reasonably believed that the defense would be successful if litigated;

(4) Whether AT&T made a good faith effort to avoid infringing the patent, for example, that AT&T took remedial action upon learning of the patent by ceasing infringing activity or attempting to design around the patent;

(5) Whether AT&T tried to cover up its infringement; and

(6) Whether AT&T obtained, and relied on, a legal opinion that appeared to it to be well-supported and believable and that advised AT&T that the system or method did not infringe the ` 114 or ` 768 patent, or that the ` 114 or ` 768 patent was invalid.

The fact that you may have determined that AT&T was wrong and that the patent is infringed does not mean that AT&T's infringement was willful. All that is required to avoid a finding of willful infringement is that AT&T had a good faith belief that it did not infringe, or that the patent was invalid, and that its belief was reasonable under all of the circumstances.

The issue of willful infringement is not relevant to your decision of whether there is infringement. A finding of willful infringement may, in certain circumstances, result in the court awarding the patent owner increased damages. If you decide that AT&T willfully infringed the ` 114 or ` 768 patent claims, then it will be the Court's job to decide whether or not to award increased damages to TGIP. You should not consider willful infringement in making your damage award, if any.

14

## VII. Invalidity

Only a valid patent may be infringed. For a patent to be valid, the invention claimed in the patent must be new and non-obvious. A patent cannot take away from people their right to use what was known or what would have been obvious when the invention was made.

AT&T asserts that the claims in the ` 114 and ` 768 patents are not valid because they are not new and/or are obvious. Each claim in a patent issued by the United States Patent Office is presumed to be valid. AT&T may rebut this presumption as to each claim, by proving by clear and convincing evidence that the claim in question is not valid. There are several ways in which AT&T may try to prove that the invention described in a particular claim is not new and/or is obvious, and therefore is invalid. These ways are described below. You must consider each of these separately as to each claim, and decide whether AT&T has proven any of them by clear and convincing evidence.

### Prior Art

Some of these instructions will refer to "prior art," or a "prior art reference." Prior art means technology and information that was accessible to the interested public before June 6, 1994. AT&T is relying on various items of prior art. AT&T and TGIP agree that the following reference is prior art, and there is no dispute that this reference came before the invention claimed in both the '114 and '768 Patents:

      (1)   the Yamaki reference.

AT&T is also relying on items that TGIP does not agree are prior art:

      (2)   the MCI prepaid calling card system; and

      (3)   the Western Union prepaid calling card system.

AT&T must prove that these items are prior art. In order to do so, AT&T must prove that the items fall within one or more of the different categories of prior art recognized by the patent laws. These categories include:

(1)    anything that was publicly known or used in the United States by someone other than the inventor before the inventor made the invention;

(2)    anything that was in public use or on sale in the United States more than one year before June 6, 1994;

(3)    anything that was patented or described in a printed publication anywhere in the world before the inventor made the invention, or more than one year before June 6, 1994; and

(4)    anything that was invented by another person in this country before the inventor made the invention, if the other person did not abandon, suppress or conceal his or her prior invention.

## 1. Prior Public Use

AT&T contends that claims 1 and 6 of the ` 114 patent, and claims 1 and 11 of the ` 768 patent are invalid because the inventions defined in those claims were publicly used in the United States before it was invented by the patentee. You are instructed that the inventions defined by claims 1 and 6 of the ` 114 patent were invented on June 1993. Because the ` 768 patent is a continuation of the ` 114 patent, the inventions of claims 1 and 11 of the ` 768 patent are also considered to have been invented on June 1993.

A patent claim is invalid if the invention defined by that claim was publicly used by someone other than the patentee in the United States before it was invented by the patentee. An invention is publicly used if it is used by the inventor or by a person who is not under any limitation, restriction, or obligation of secrecy to the inventor. Secret use by a third party is not an invalidating public use. If the public use was an experimental use performed in order to bring

the invention to perfection or to determine if the invention was capable of performing its intended purpose, then such a use does not invalidate the claim.

## 2. Invalidity by Obviousness

AT&T also contends that the claims of the `114 and `768 patents are invalid because the claimed subject matter was obvious to one of ordinary skill in the art at the time the invention was made. To be patentable, an invention must not have been obvious to a person of ordinary skill in the pertinent art at the time the invention was made.

Obviousness may be shown by considering more than one item of prior art. AT&T contends that the invention claimed in claims 1 and 6 of the `114 patent, and claims 1 and 11 of the `768 patent would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made in light of the following prior art references:

(1) the Yamaki reference;

(2) the Western Union prepaid calling card system;

(3) the MCI prepaid calling card system.

The question is, would it have been obvious to those skilled in the art who knew of the prior art to make the claimed invention? If the answer to that question is yes, then the patent claims are invalid. AT&T has the burden of proving by clear and convincing evidence that claims 1 and 6 of the `114 patent, and claims 1 and 11 of the `768 patent are invalid for obviousness.

Obviousness is determined from the perspective of a person of ordinary skill in the field of the invention. The issue is not whether the claimed invention would have been obvious to you, to me as a Judge, or to a genius in the field of the invention. Rather, the question is whether or not the invention would have been obvious to a person of ordinary skill in the field of the invention.

You must not use hindsight when comparing the prior art to the invention for obviousness. In making a determination of obviousness or non-obviousness, you must consider only what was known before the invention was made. You may not judge the invention in light of present day knowledge.

In determining whether or not these claims would have been obvious, you should make the following determinations:

First, what is the scope and content of the prior art?

Second, what is the difference or differences between the prior art and each asserted claim of the ` 114 and the ` 768 patents, given the ordinary level of skill in the art?

Third, are there any objective indications of non-obviousness?

Against this background, you must decide whether or not the invention covered by the ` 114 and the ` 768 patent claims would have been obvious.

### a. Scope and Content

Determining the scope and content of the prior art means that you should determine what is disclosed in the prior art relied upon by AT&T. You must decide whether this prior art was reasonably relevant to the particular problem the inventor faced in making the invention covered by the patent claims. Such relevant prior art includes prior art in the field of the invention, and also prior art from other fields that a person of ordinary skill would look to when attempting to solve the problem.

### b. Difference or Differences

In determining the differences between the invention covered by the patent claims and the prior art, you should not look at the individual differences in isolation. You must consider the

18

claimed invention as a whole and determine whether or not it would have been obvious in light of all the prior art.

It is common sense that familiar items may have been obvious beyond their primary purposes, and a person of ordinary skill often will be able to fit the teachings of multiple patents together likes pieces of a puzzle. Multiple references in the prior art can be combined to show that a claim is obvious. Any need or problem known in the field and addressed by the patent can provide a reason for combining the elements in the manner claimed. To determine whether there was an apparent reason to combine the known elements in the way a patent claims, you can look to interrelated teachings of multiple patents, to the effects of demands known to the design community or present in the marketplace, and to the background knowledge possessed by a person of ordinary skill in the art. Neither the particular motivation of the person of ordinary skill in the art nor the alleged purpose of the patentee controls. One of ordinary skill in the art is not confined only to prior art that attempts to solve the same problem as the patent claim.

### c. Objective Indications

You also must consider what are referred to as objective indications of non-obviousness. Some of these indications of non-obviousness are:

(1) Long-felt and unmet need in the art for the invention;

(2) Failure of others to achieve the results of the invention;

(3) Commercial success of the invention;

(4) Copying of the invention by others in the field;

(5) Whether the invention was contrary to accepted wisdom of the prior art;

19

(6) Expression of disbelief of skepticism by those skilled in the art upon learning of the invention;

(7) Unexpected results;

(8) Praise of the invention by those in the field; and

(9) The taking of licenses under the patent by others.

These objective indications are only relevant to obviousness if there is a connection, or nexus, between them and the invention covered by the patent claims. For example, commercial success is relevant to obviousness only if the success of the product is related to a feature of the patent claims. If the commercial success is the result of something else, such as innovative marketing, and not to a patented feature, then you should not consider it to be an indication of non-obviousness.

If you conclude that the prior art discloses all the elements of the claimed invention, but those elements are in separate items, you must then consider whether or not it would have been obvious to combine those items. A claim is not obvious merely because all of the elements of that claim already existed. One test you may consider when determining an asserted claim of obviousness, is whether there was some teaching, suggestion, or motivation to combine the items in the prior art into the particular claimed construction.

Again, you must compare separately each of the four claims of the patent asserted by TGIP, with the prior art references to determine if one or more of the claims was obvious.

## VIII. Laches

AT&T contends that TGIP delayed inexcusably and unreasonably in filing of lawsuit asserting infringement of the ` 114 patent. The owner of a patent may be entitled to recover damages against an alleged infringer only for acts that occurred after it filed a lawsuit where:

> (1) the patent holder delayed filing the lawsuit for an unreasonably long period of time;

> (2) there was no excuse for the patent holder's delay in filing the lawsuit; and

> (3) the allegedly infringing party has been or will be prejudiced in a significant way due to the patent holder's delay in filing the lawsuit.

This is referred to as laches. Only the period of time after the ` 114 patent issued may be considered. The ` 114 patent was issued on April 23, 1996.

Whether TGIP's delay was unreasonably long is a question that must be answered by considering the facts and circumstances as they existed during the period of delay in the way that reasonably prudent businesspeople would have viewed them. There is no set list of acceptable or unacceptable justifications for an otherwise unreasonable delay in bringing a lawsuit. For example, evidence of the following might serve as a justification or excuse for any delay in the filing of this lawsuit:

> (1) Being involved in other litigation during the period of delay;

> (2) Being involved in negotiations with the allegedly infringing party during the period of delay;

> (3) Being involved in a dispute about ownership of the patent during the period of delay; or

> (4) Minimal amounts of allegedly infringing activity by AT&T during the period of delay.

Any particular justification or excuse offered by TGIP in this case must be evaluated in light of the facts and circumstances that existed during the period of delay in this case.

Prejudice to AT&T as a result of any delay by TGIP in filing this lawsuit can be economic or evidentiary in nature. Whether AT&T suffered evidentiary prejudice is a question that must be answered by evaluating whether any unreasonable delay in filing this case resulted in AT&T not being able to present a full and fair defense on the merits to TGIP's infringement claim. Not being able to present a full and fair defense on the merits to an infringement claim can occur due to the loss of important records, the death or impairment of an important witness, the unreliability of memories about important events because they occurred in the distant past, or other similar types of things.

Whether AT&T suffered economic prejudice is a question that must be answered by evaluating whether any unreasonable delay in filing this case resulted in AT&T changing its economic position in a significant way during the period of delay, and also whether AT&T's losses as a result of that change in economic position could have been avoided if TGIP had filed this lawsuit sooner. Having to pay damages to TGIP if AT&T is found to infringe on its patent does not amount to economic prejudice by itself; rather, AT&T's liability for infringement damages or the other economic losses that may be incurred by AT&T if found to be an infringer must have been avoidable if TGIP had filed this lawsuit sooner.

**F. Damages**

If you find that there has been an infringement, the owner of a patent is entitled to an award of damages adequate to compensate for the infringement. You should not interpret the fact that I have given instructions about damages as an indication in any way that I believe that TGIP

should, or should not, win this case. It is your task first to decide whether AT&T is liable. I am instructing you on damages only so that you will have guidance in the event you decide that AT&T is liable and that TGIP is entitled to recover money from AT&T.

In this case, TGIP is seeking damages in the form of a reasonable royalty. Generally, a reasonable royalty is defined by the patent laws as the reasonable amount that someone wanting to use the patented invention should expect to pay to the patent owner and the owner should expect to receive.

A royalty is the amount of money a licensee pays to a patent owner for each article the licensee makes (or uses or sells) under the patent. A reasonable royalty is the amount of money a willing patent owner and a willing prospective licensee would have agreed upon at the time of the infringement for a license to make the invention. It is the royalty that would have resulted from an arms-length negotiation between a willing licensor and a willing licensee, assuming that both parties believed the claims in question to be valid and infringed and that the licensee would respect the patent. In making your determination of the amount of a reasonable royalty, it is important that you focus on the time period when the infringer first infringed the patent and the facts that existed at that time. Your determination does not depend on the actual willingness of the parties to this lawsuit to engage in such negotiations. Your focus should be on what the parties' expectations would have been had they entered negotiations at the time the infringing activity began and the facts that existed at the time. AT&T's actual profits from use of the claims you find are infringing may or may not bear on the reasonableness of an award based on a reasonable royalty.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time infringement began. Some of the kinds of factors that you may consider in making your determination are:

(1) whether the patent holder had an established royalty for the invention; in the absence of such a licensing history, any royalty arrangements that were generally used and recognized in the particular industry at that time;

(2) the nature of the commercial relationship between the patent owner and the licensee such as whether they were competitors or whether their relationship was that of an inventor and a promoter;

(3) the established profitability of the patented product, its commercial success and its popularity at the time;

(4) whether the patent owner had an established policy of granting licenses or retaining the patented invention as its exclusive right, or whether the patent holder had a policy of granting licenses under special conditions designed to preserve his monopoly;

(5) the size of the anticipated market for the invention at the time the infringement began;

(6) the duration of the patent and of the license, as well as the terms and scope of the license, such as whether it is exclusive or nonexclusive or subject to territorial restrictions;

(7) the rates paid by the licensee for the use of other patents comparable to the plaintiff's patent;

(8) whether the licensee's sales of the patented invention promote sales of its other products and whether the invention generates sales to the inventor of his nonpatented items;

24

(9) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;

(10) the extent to which the infringer used the invention, and any evidence probative of the value of such use;

(11) the portion of the profits in the particular business that are customarily attributable to the use of the invention or analogous inventions;

(12) the portion of the profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks or significant features or improvements added by the infringer;

(13) the opinion and testimony of qualified experts and of the patent holder;

(14) any other factors which, in your mind, would have increased or decreased the royalty the infringer would have been willing to pay and the patent owner would have been willing to accept, acting as normally prudent business people;

(15) the amount that a licensor and a licensee would have agreed upon just before the ` 114 and the ` 768 patents were issued if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee who desired, as a business proposition, to obtain a license to use a particular method embodying the patented invention would have been willing to pay as a royalty and still be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

You have heard evidence that AT&T received revenue from recharge transactions conducted from locations other than the point of sale. TGIP does not contend that these out-of-store recharge transactions infringe either patent, and you therefore may not award any damages

on the ground that these transactions infringe TGIP's patents. However, you may award damages to TGIP based on AT&T's sale of such recharge transactions if TGIP proves by a preponderance of the evidence that such sales would normally be expected to accompany the sale of AT&T P.O.S.A. ("Point-of-Sale Activation") phone cards. These are called "convoyed sales."

You must not award the plaintiff more damages than are adequate to compensate for the infringement. Nor may you include damages that are speculative, damages that are only possible or damages that are based on guesswork.

## VIII. Instructions for Deliberations

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges—judges of the facts. Your only interest is to the seek the truth from the evidence in the case.

Do not let bias, prejudice or sympathy play any part in your deliberations. This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth and holding the same or similar stations in life. A corporation is entitled to the same fair trial at your hands as a private individual and should be treated as such. The law is no respecter of persons; all persons, including corporations and other organizations, stand equal before the law, and are to be dealt with as equals in a court of justice.

When you retire to the jury room to deliberate on your verdict, you will take this charge with you as well as exhibits which the Court has admitted into evidence. When you go to the jury room, the first thing that you should do is select one of your number as your Foreperson, who will help to guide your deliberations and will speak for you here in the courtroom. The Foreperson should read, or have another juror read, these instructions to the jury. You should then begin your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you on your conduct during the trial. Do not discuss the case unless all jurors are present in the jury room. After you have reached your unanimous verdict, your Foreperson must fill in your answers to the written questions and initial and date the verdict form. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

Remember that you must consider each claim separately and consider each step in each claim. So, in analyzing claim 1 of the ` 114 patent, for example, you should:

(1) First read each of the nine elements of that claim, together with the definitions I have given you for words in that claim;

(2a) Determine whether TGIP has proved that, more likely than not, AT&T used each and every one of these elements in the AT&T prepaid calling card system;

(2b) If TGIP did not prove one or more of the elements was used in the AT&T prepaid calling card system, then determine if TGIP has proved that AT&T used an equivalent structure for each structure of the patent claim that is not literally present in AT&T's method;

(3) Repeat these steps for each of the other three claims;

27

(4) If you find any claim was infringed then you must decide whether TGIP has proved by clear and convincing evidence that the infringement was willful;

(5) Next, remembering the instructions I have given you about the factors you should consider about invalidity, you must decide whether AT&T has proved by clear and convincing evidence that any or all of the claims are invalid.

You will then answer questions about damages and laches, if applicable.

If you want to communicate with me at any time, please give a written message or question to the court security officer, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally.

The presiding juror or any other juror who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again. After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise. You may now retire to the jury room to conduct your deliberations.

SIGNED September 14, 2007.

_____

Judge Ron Clark
United States District Judge

# Appendix A

5,511,114 – Claim 1

1.    A pre-paid **calling card** system to enable customers to purchase **calling cards** at **predetermined locations** and to use such **calling cards** to access a **telephone network** having at least one telephone, comprising:

a plurality of **calling cards**, each of said **calling cards** having a security number associated therewith that must be entered at a telephone to obtain access to the **telephone network**;

a host computer including at least one input port and a database for storing security numbers;

at least one **data terminal** located at a **predetermined location** remote from the host computer and connectable to the input port for **associating, at the host computer, an amount of call authorization to a security number** of a **calling card** using data transmitted between the **data terminal** and the host computer during one or more charging transactions, the means for associating of the **data terminal** including:

means for entering the security number;

means, operative during any initial transaction and any recharge transaction, for entering any monetary amount corresponding to the amount of call authorization;

means for connecting to the host computer to transfer the security number and the **call authorization amount**; and

means responsive to the transfer for receiving a verification message from the host computer authorizing receipt of the monetary amount to thereby associate at the host computer the **call authorization amount** to the security number, wherein the **calling card** does not store the **call authorization amount**; and

wherein the database includes a record for each **calling card** security number having a **call authorization amount** associated therewith, the record including a balance; and

a call processor running on the host computer and responsive to entry of the security number for enabling the customer to access the **telephone network** using the telephone, the call processor using the balance in the record associated with the security number for monitoring call progress and terminating the customer's access to the **telephone network** when the balance is exhausted.

**5,511,114 – Claim 6**

6.  A pre-paid **calling card** system to enable customers to purchase **calling cards** at retail establishments and to use such **calling card** to access a **telephone network** having at least one telephone, comprising:

a plurality of **calling cards**, each of said **calling cards** having a security number associated therewith that must be entered by a customer at the telephone to obtain access to the **telephone network**;

a host computer connectable to the **telephone network** and including at least on input port and a database for storing security numbers;

a plurality of **data terminals** located at the retail establishments remote from the host computer and each connectable to the input port for **associating, at the host computer, an amount of call authorization to a security number** of a **calling card** using data transmitted between the **data terminal** and the host computer during one or more charging transactions, the means for associating of each **data terminal** including:

means for reading a **calling card** to determine the security number;

means, operative during any initial transaction and any recharge transaction, for entering a monetary amount corresponding to the amount of call authorization;

means for transferring to the host computer the security number and the **call authorization amount**; and

means responsive to the transfer for receiving a verification message from the host computer authorizing receipt by the retail establishment of the monetary amount to thereby associate at the host computer the **call authorization amount** to the security number, wherein the **calling card** does not store the **call authorization amount**;

wherein the database includes a record for each **calling card** security number, the record including the initial **call authorization amount** and any recharge **call authorization amount**, a balance, and **data terminal** identification codes identifying the **data terminals** of the plurality of **data terminals** at which the initial and any recharge **call authorization amounts** were issued:

a call processor running on the host computer end responsive to entry of the security number by a customer for enabling the customer to access the **telephone network** using the telephone, the cell processor using the balance in the record associated with the security number for monitoring call progress and terminating the customer's access to the **telephone network** when the balance is exhausted.

**5,721,768 – Claim 1**

1.  A method to enable customers to obtain pre-paid **calling card** accounts from a plurality of **point-of-sale location**s and to use the pre-paid **calling card** accounts to access a **telephone network** using a telephone, the method comprising:

transferring **activation information** associated with a particular pre-paid **calling card** account from a **data terminal** located at a particular one of the point of sale locations to a remote location having a database of pre-paid **calling card** accounts, the **activation information** being used to identify the particular pre-paid **calling card** account, the particular pre-paid **calling card** account being associated with a distributor of the particular pre-paid **calling card** account in order to track activation and distribution of the particular pre-paid **calling card** account;

activating the particular pre-paid **calling card** account in the database of **prepaid calling card account**s in response to receipt of the **activation information** by **associating an active call authorization amount with the particular pre-paid calling card account**;

for each pre-paid **calling card** account that is activated, maintaining in the database information sufficient to identify: (i) a date on which the particular pre-paid **calling card** account is activated, (ii) a particular **point-of-sale location** at which the particular pre-paid **calling card** account is activated, and (iii) the active **call authorization amount** that was associated with the particular pre-paid **calling card** account when activated on said date and from said **point-of-sale location**;

receiving **access information** transferred from a telephone to a call processor having access to the database of pre-paid **calling card** accounts, the call processor using the **access information** to identify the particular pre-paid **calling card** account and to establish a telephone call from the telephone to a desired number using the **telephone network**;

reducing the **active call authorization amount** associated with the particular pre-paid **calling card** account in correspondence with usage of the **telephone network**;

terminating access to the **telephone network** when the **active call authorization amount** is exhausted; and

billing a given distributor for the pre-paid **calling card** accounts so activated and associated with the given distributor as indicated by information maintained in the database.

**5,721,768 – Claim 11**

11. A computerized system used to activate pre-paid **calling cards** and to track usage of the pre-paid **calling cards**, the computerized system comprising:

a database storing information associated with a plurality of prepaid **calling cards**;

a host computer coupled to the database and having a port connected to a **telephone network**, the host computer receiving **activation information** associated with a particular pre-paid **calling card** from a remote **point-of-sale location** via the **telephone network**, the **activation information** being used to identify the particular pre-paid **calling card**, the particular pre-paid **calling card** being associated with a distributor of the particular pre-paid **calling card**, the host computer activating the particular pre-paid **calling card** in the database in response to receipt of the **activation information** by associating an **active call authorization amount** with the particular pre-paid **calling card**; the host computer being further operative to increase the active **call authorization amount** associated with the particular pre-paid calling card in response to given recharge information; and

a call processor coupled to the database and to the **telephone network** to receive **access information** transferred from a telephone, the **access information** being used by the call processor to identify the particular pre-paid **calling card** and to establish a telephone call from the telephone to a desired telephone number using the **telephone network**, the call processor reducing the **active call authorization amount** associated with the particular pre-paid **calling card** in correspondence with usage of the **telephone network** and halting communication with the desired telephone number when the **active call authorization amount** is exhausted;

wherein, for each pre-paid **calling card** that is activated, the database includes information sufficient to identify: (i) a date on which the particular pre-paid **calling card** is activated, (ii) a date on which the particular pre-paid **calling card** is recharged, and (iii) the active **call authorization amount** that was associated with the particular pre-paid **calling card** when activated or when recharged; and

the host computer also operative to bill a given distributor for the pre-paid **calling card** accounts so activated or recharged and associated with the given distributor as indicated by information in the database.

| CLAIM PHRASES | DEFINITION | CLAIM(S) WHERE USED |
|---|---|---|
| call authorization amount | **A monetary amount to be used to pay for call service** | 1, 6 ('114) |
| active call authorization amount | **A monetary amount to be used to pay for call service** | 1, 11 ('768) |
| associating, at the host computer, an amount of call authorization to a security number | **As part of the activation process, and not before, the amount of call authorization is linked in the host computer database to a security number for that card** | 1, 6 ('114) |
| associating an active call authorization amount with the particular pre-paid calling card account | **As part of the activation process, and not before, the active call authorization amount is linked in the remote location database, to the pre-paid calling card account** | 1, 11 ('768) |
| calling card | **A card, which may be made of various materials and in various shapes, which has associated with it a combination of numerals, letters, and/or characters (sometimes called a security number or code) that can be entered at a telephone to obtain access to the telephone network or system** | 1, 6 ('114); 1, 11 ('768) |
| prepaid calling card account | **A record maintained in a data base which, when activated, allows a user with the access information for that account to obtain access to a phone system or network** | 1, 11 ('768) |
| data terminal | **A device that can transmit and receive data to a host computer to allow for charging and recharging a calling card or calling card account** | 1, 6 ('114); 1, ('768) |
| predetermined locations | **A business establishment or kiosk which may be automated or staffed by one or more persons** | 1 ('114) |
| point-of-sale locations | **A business establishment or kiosk which may be automated or staffed by one or more persons** | 1, 11 ('768) |
|  |  |  |

| access information | **A combination of numerals, letters, and/or characters that can be transmitted from a phone to a call processor, which identifies one, and only one pre-paid calling card account** | 1, 11 ('768) |
|---|---|---|
| activation information | **The data transmitted that initially makes it possible to associate a dollar amount with a particular calling card account** | 1, 11 ('768) |
| recharge information | **Data transmitted that makes it possible to associate a dollar amount with a particular previously activated calling card account** | 11 ('768) |
| telephone network | **The infrastructure over which telephone calls are made** | 1, 6 ('114); 1, 11 ('768) |

| **MEANS-PLUS-FUNCTION CLAIM PHRASES** | **DEFINITION** | **CLAIM(S) WHERE USED** |
|---|---|---|
| Means for entering the security number | **Function**: inputting or entering a security number<br><br>**Structure**: (1) a keypad; (2) a cardreader; (3) an optical scanner; and (4) a voice recognition card connected to a microphone for providing limited speaker-independent or speaker-dependent discrete or continuous voice recognition; or equivalents thereof | 1 ('114) |
| Means, operative during any initial transaction and any recharge transaction, for entering any monetary amount corresponding to the amount of call authorization | **Function**: inputting or entering a monetary amount<br><br>**Structure**: (1) a keypad; (2) a cardreader; (3) an optical scanner; and (4) a voice recognition card connected to a microphone for providing limited speaker-independent or speaker-dependent discrete or continuous voice recognition; or equivalents thereof | 1 ('114) |

| | | |
|---|---|---|
| Means, operative during any initial transaction, for entering a monetary amount corresponding to the amount of call authorization | **Function**: inputting or entering a monetary amount<br><br>**Structure**: (1) a keypad; (2) a cardreader; (3) an optical scanner; and (4) a voice recognition card connected to a microphone for providing limited speaker-independent or speaker-dependent discrete or continuous voice recognition; or equivalents thereof | 6 ('114) |
| Means for connecting to the host computer | **Structure**: a modem, either wireless or hardwired, or equivalents thereof | 1 ('114) |
| Means for reading a calling card to determine the security number | **Function**: reading the calling card to determine the security number<br><br>**Structure**: a keypad, card reader, optical scanner, voice recognition card connected to a microphone for providing limited speaker-independent or speaker-dependent discrete or continuous voice recognition, or equivalents thereof | 6 ('114) |